# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPORTERS COMMITTEE FOR FREEDOM
OF THE PRESS,

    *Plaintiff*,

  v.

OFFICE OF THE ATTORNEY GENERAL, *et al.*,

    *Defendants*.

Case No.  21-cv-1294 (DLF)

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**TABLE OF EXHIBITS** ....................................................................................................... ii

**TABLE OF AUTHORITIES** ............................................................................................... iii

**INTRODUCTION** ................................................................................................................ 1

**BACKGROUND** ................................................................................................................. 2

I.     The Department's News Media Policy ............................................................................ 2

II.    Plaintiff's FOIA Requests ............................................................................................... 4

III.   The Instant Litigation ...................................................................................................... 5

**STANDARD OF REVIEW** ................................................................................................. 7

**ARGUMENT** ...................................................................................................................... 8

I.     The Department's Search Was Reasonable. .................................................................... 8

II.    Pre-Decisional, Deliberative Material Regarding Potential Changes Relating to
       the News Media Policy Were Properly Withheld Pursuant to Exemption 5. ................. 11

       A.    Deliberative Memorandum and Briefing Slides Proposing Options for
             Changes Relating to News Media Policy ......................................................... 13

       B.    Drafts of, and Deliberations Regarding, Memorandum and Briefing Slides
             Proposing Options for Changes Relating to News Media Policy ....................... 17

       C.    Draft Proposed Options Relating to Changing News Media Policy .................... 20

       D.    Deliberative Engagement Strategy. ................................................................... 25

       E.    Potential Policy Modifications Being Pursued by Criminal Division ................. 27

       F.    Deliberative Discussion Regarding Potential Response to Press Inquiry ........... 27

III.   Deliberative Legal Advice Relating to Potential Changes Relating to the News
       Media Policy Was Properly Withheld Pursuant to Exemption 5. .................................... 29

IV.   Phone Numbers and Email Addresses of DOJ Employees and Members of the
       Press Were Properly Withheld Pursuant to Exemption 6. ............................................... 30

V.    Name and Email Address of Non-SES FBI Special Agent Were Properly
       Withheld Pursuant to Exemptions 6, 7(C), and 7(E). ..................................................... 32

VI.   All Reasonably Segregable, Non-Exempt Information Has Been Released. ................... 36

VII.  Disclosure of the Withheld Information Would Harm Interests Protected by FOIA ....... 38

**CONCLUSION** .................................................................................................................. 41

## TABLE OF EXHIBITS

**Exhibit 1, Declaration of Vanessa R. Brinkmann (Nov. 4, 2022)**

      Exhibit A, Copies of Plaintiffs' FOIA Requests

      Exhibit B, OIP's February 19, 2021 Acknowledgment Letter

      Exhibit C, OIP's July 16, 2021 Interim Response and Corresponding Production

      Exhibit D, OIP's October 5, 2021 Interim Response

      Exhibit E, OIP's June 2, 2022 Final Response Letter and Corresponding Production

      Exhibit F, OIP's *Vaughn* Index

**Exhibit 2, Declaration of Michael G. Seidel (Nov. 4, 2022)**

      Exhibit A, FBI *Vaughn* Index

# TABLE OF AUTHORITIES

**Cases**

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
　641 F.3d 504 (D.C. Cir. 2011) ........................................................................ 9

*Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*,
　370 F. Supp. 3d 116 (D.D.C. 2019) ................................................................ 28

*August v. FBI*,
　328 F.3d 697 (D.C. Cir. 2003) ........................................................................ 7

*Baker & Hostetler LLP v. U.S. Dep't Of Commerce*,
　473 F.3d 312 (D.C. Cir. 2006) ........................................................................ 9

*Blackwell v. FBI*,
　646 F.3d 37 (D.C. Cir. 2011) .................................................................... 32, 33

*Brayton v. Off. of the U.S. Trade Rep.*,
　641 F.3d 521 (D.C. Cir. 2011) ........................................................................ 7

*Campaign Legal Ctr. v. U.S. Dep't of Justice*,
　34 F.4th 14 (D.C. Cir. 2022) .................................................................. *passim*

*Chambers v. U.S. Dep't of Interior*,
　568 F.3d 998 (D.C. Cir. 2009) ........................................................................ 9

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Labor*,
　478 F. Supp. 2d 77 (D.D.C. 2007) ................................................................ 27

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*,
　746 F.3d 1082 (D.C. Cir. 2014) .................................................................... 32

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*,
　45 F.4th 963 (D.C. Cir. 2022) ...................................................................... 27

*Clemente v. FBI*,
　867 F.3d 111 (D.C. Cir. 2017) ...................................................................... 31

*Coastal States Gas Corp. v. Dep't of Energy*,
　617 F.2d 854 (D.C. Cir. 1980) ...................................................................... 12

*Defenders of Wildlife v. U.S. Dep't of the Interior*,
　No. 03-1192, 2004 WL 842374 (D.D.C. Apr. 13, 2004) ................................ 10

*Dep't of Air Force v. Rose*,
　425 U.S. 352 (1976) ...................................................................................... 30

*Dep't of Interior v. Klamath Water Users Protective Assn.*,
532 U.S. 1 (2001) ................................................................................................ 12

*DiBacco v. U.S. Army*,
795 F.3d 178 (D.C. Cir. 2015) ........................................................................ 8, 9

*Elec. Privacy Info. Ctr. v. DHS*,
777 F.3d 518 (D.C. Cir. 2015) ............................................................................ 31

*Encino Motorcars, LLC v. Navarro*,
138 S. Ct. 1134 (2018) ........................................................................................ 7

*EPA v. Mink*,
410 U.S. 73 (1973) .............................................................................................. 11

*FBI v. Abramson*,
456 U.S. 615 (1981) .............................................................................................. 7

*Food Mktg. Inst. v. Argus Leader Media*,
139 S. Ct. 2356 (2019) .......................................................................................... 7

*Gilliam v. U.S. Dep't of Justice*,
128 F. Supp. 3d 134 (D.D.C. 2015) ...................................................................... 7

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984) ............................................................................. 28

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ............................................................................................. 7

*Juarez v. U.S. Dep't of Justice*,
518 F.3d 54 (D.C. Cir. 2008) ............................................................................. 36

*Judicial Watch v. U.S. Dep't of Treasury*,
796 F. Supp. 2d 13 (D.D.C. 2011) ...................................................................... 27

*Judicial Watch v. U.S. DHS*,
736 F. Supp. 2d 202 (D.D.C. 2010) .................................................................... 27

*Judicial Watch v. U.S. Dep't of Def.*,
847 F.3d 735 (D.C. Cir. 2017) ........................................................................... 12

*Judicial Watch v. U.S. Dep't of Justice*,
20 F.4th 49 (D.C. Cir. 2021) .............................................................. 14, 15, 16

*Judicial Watch v. Food & Drug Admin.*,
449 F.3d 141 (D.C. Cir. 2006) ...................................................... 12, 17, 30, 38

*Judicial Watch v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013) ................................................................ 8

*Light v. U.S. Dep't of Justice*,
   968 F. Supp. 2d 11 (D.D.C. 2013) ............................................................ 7

*Mayer Brown LLP v. IRS*,
   562 F.3d 1190 (D.C. Cir. 2009) .............................................................. 34

*McCready v. Nicholson*,
   465 F.3d 1 (D.C. Cir. 2006) ...................................................................... 9

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) .................................................. 28, 29, 35

*Meeropol v. Meese*,
   790 F.2d 942 (D.C. Cir. 1986) .................................................................. 9

*Mil. Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) .................................................................. 8

*NARA v. Favish*,
   541 U.S. 157 (2004) ................................................................................ 32

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
   402 F. Supp. 2d 211 (D.D.C. 2005) ........................................................ 35

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ................................................................................ 11

*Nova Oculus Partners, LLC v. U.S. Sec. & Exch. Comm'n*,
   486 F. Supp. 3d 280 (D.D.C. 2020) ................................................... 8, 32

*Oglesby v. U.S. Dep't of the Army*,
   920 F.2d 57 (D.C. Cir. 1990) ................................................................ 8-9

*Perry v. Block*,
   684 F.2d 121 (D.C. Cir. 1982) .................................................................. 9

*Poitras v. DHS*,
   303 F. Supp. 3d 136 (D.D.C. 2018) ........................................................ 35

*Pub. Emps. for Envt. Resp. v. Int'l Boundary & Water Comm'n.*,
   740 F.3d 1954 (D.C. Cir. 2014) .............................................................. 34

*Pub. Emps. for Env't Resp. v. DHS*,
   575 F. Supp. 3d 34 (D.D.C. 2021) .......................................................... 16

*Reed v. NLRB*,
    927 F.2d 1249 (D.C. Cir. 1991) ............................................................. 32

*Reporters Committee for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ......................................................... *passim*

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
    235 F.3d 598 (D.C. Cir. 2001) ............................................................. 11

*Roseberry-Andrews v. DHS*,
    299 F. Supp. 3d 9 (D.D.C. 2018) ................................................... 34, 37

*Russell v. Dep't of the Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) ........................................................... 24

*Sack v. Dep't of Def.*,
    823 F.3d 687 (D.C. Cir. 2016) ..................................................... 31, 33

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 9

*Schoenman v. FBI*,
    575 F. Supp. 2d 166 (D.D.C. 2008) ....................................................... 31

*Shapiro v. U.S. Dep't of Justice*,
    893 F.3d 796 (D.C. Cir. 2018) ............................................................... 8

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ........................................................... 36

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ............................................................. 28

*U.S. Dep't of Def. v. FLRA*,
    510 U.S. 487 (1994) ............................................................................. 32

*U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*,
    489 U.S. 749 (1989) ............................................................................. 32

*U.S. Dep't of State v. Washington Post Co.*,
    456 U.S. 595 (1982) ............................................................................. 30

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    141 S. Ct. 777 (2021) ................................................................. *passim*

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ..................................................................... 37, 38

*Vazquez v. U.S. Dep't of Justice*,
  887 F. Supp. 2d 114 (D.D.C. 2012) ........................................................................ 34

*Walston v. U.S. Dep't of Def.*,
  238 F. Supp. 3d 57 (D.D.C. 2017) ........................................................................... 30

*Weisberg v. U.S. Dep't of Justice*,
  745 F.2d 1476 (D.C. Cir. 1984) ................................................................................. 9

*Wilbur v. CIA*,
  355 F.3d 675 (D.C. Cir 2004) ..................................................................................... 9

**Statutes**

5 U.S.C. § 552 ..................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 7

**Federal Regulations**

28 C.F.R. § 0.25 ........................................................................................................... 28

28 C.F.R. § 50.10 ............................................................................................... *passim*

AG Order No. 5524-2022 (Oct. 26, 2022) ................................................................... 3

Freedom of Information Act,
  74 Fed. Reg. 4683 (Jan. 21, 2009) .......................................................................... 37

Policy Regarding Obtaining Information From, or Records of, Members of the News
  Media; and Regarding Questioning, Arresting, or Charging Members
  of the News Media
  80 Fed. Reg. 2819 (Jan. 21, 2015) ............................................................................ 3

**Other Authorities**

Organizational Chart, U.S. Department of Justice,
  https://www.justice.gov/agencies/chart ................................................................. 15

H.R. Rep. No. 114-391 (2016) .................................................................................... 37

S. Rep. No. 114-4 (2016) ............................................................................................. 37

# INTRODUCTION

This case concerns two Freedom of Information Act (FOIA) requests made by Plaintiff Reporters Committee for Freedom of the Press (RCFP or Plaintiff) to two components of the Department of Justice (DOJ or the Department).  The FOIA requests sought documents relating to the Department's policy, codified at 28 C.F.R. § 50.10, regarding the obtaining of information from members of the news media (News Media Policy or Policy).  Specifically, RCFP requested all versions of the News Media Policy in effect during a specified time period, emails containing proposed or enacted modifications of the Policy during that same period, and emails to or from three Department officials containing a phrase specified by RCFP.

The Department performed a reasonable search for responsive documents, utilizing search parameters crafted in consultation with RCFP.  After performing its search, the Department produced all responsive documents subject to FOIA not otherwise exempt from disclosure.  In its initial July 2021 response, the Department informed RCFP that no modifications to the News Media Policy had been promulgated "since January 21, 2017," as the Code of Federal Regulations indicated.  Most of the responsive documents, therefore, contained deliberations about potential changes relating to the Policy that ultimately did not come to fruition during the deliberative process reflected in the documents at issue.  As such, many of the responsive documents—in full or in part—are protected from disclosure by Exemption 5 and the deliberative process privilege.  Other portions are protected by the attorney-client privilege as well as Exemptions 6, 7(C), and 7(E).

The Department properly withheld information protected by these exemptions to prevent the harm that these exemptions are designed to avoid.  Disclosing predecisional deliberations among Department and FBI officials about potential modifications relating to important law

enforcement techniques used in highly sensitive investigations would foreseeably risk chilling candid evaluations of policy proposals pertaining to controversial and high-profile topics, leaving Department decisionmakers with an incomplete picture of the advantages and drawbacks of various policy alternatives. Further disclosures of internal deliberations would also risk confusing the public about the operative policy governing efforts to obtain information from members of the news media. Disclosing withheld personal information would foreseeably cause an unwarranted invasion of personal privacy and risk harm to FBI employees and systems.

The parties met and conferred about narrowing the issues requiring resolution by the Court. RCFP has maintained that all issues—the reasonableness of the Department's search as well as every withholding, whether in full or in part—remain in dispute such that briefing by the Department on all of these items is necessary. Accordingly, the Department's brief and accompanying declarations address the Department's search and all of its withholdings. Defendants[1] are entitled to summary judgment on all of these issues.

## BACKGROUND

### I.    The Department's News Media Policy

For decades, the Department has maintained a News Media Policy, which governs "obtaining information from, or records of, members of the news media" and "questioning, arresting, or charging members of the news media."[2] 28 C.F.R. § 50.10. Section 50.10 has been amended numerous times over the years. The News Media Policy was most recently revised on

---

[1] Plaintiff named the Office of the Attorney General (OAG), Office of the Deputy Attorney General (ODAG), Office of Information Policy (OIP), and the United States Department of Justice as Defendants. The only potentially proper Defendant in this matter is the Department of Justice. The Offices of the Attorney General, Deputy Attorney General, and Information Policy are components of the Department of Justice.

[2] This brief refers to this policy as the News Media Policy. Some of the documents discussed below refer to the policy by other names, including the Media Subpoena Policy.

October 26, 2022.  AG Order No. 5524-2022 (Oct. 26, 2022).  Prior to that, the last revision occurred on January 21, 2015.  80 Fed. Reg. 2,819 (Jan. 21, 2015).[3]

In 2017, at the direction of the Deputy Attorney General (DAG), the Department's Office of Legal Policy (OLP) examined the News Media Policy and identified for the DAG potential changes relating to the Policy and its implementation procedures.  Ex. 1, Decl. of Vanessa R. Brinkmann (Nov. 4, 2022), ¶ 27 (Brinkmann Decl.); Brinkmann Decl. Ex. E (OIP's June 2, 2022 Final Response Letter and Corresponding Production) at Bates 366  In formulating these options for the DAG's consideration, OLP consulted with members of the National Security Division, the Criminal Division, the FBI's Office of the General Counsel, the Office of Public Affairs, and the U.S. Attorney's Offices for the District of Columbia and Eastern District of Virginia.  Brinkmann Decl. Ex. E at Bates 366.  OLP presented the options to the DAG in the form of a memorandum as well as in PowerPoint slides which were used during an in-person briefing with the DAG in September 2017.  *Id.* at Bates 366-79, 403-22.  OLP also prepared an engagement plan to develop an internal process and engagement strategy which sought to, among other things, determine and finalize any proposed revisions relating to the News Media Policy.  *Id.* at Bates 522-25.

Ultimately, in the ensuing four years, no changes were made to the News Media Policy.  *See* 28 C.F.R. § 50.10 (indicating that the Policy was, prior to the revised Policy announced by Attorney General Garland last week, most recently amended in 2015).

---

[3] OIP is not aware of any indication that the 2022 policy—published almost two years after RCFP submitted its requests—explicitly incorporated or adopted the specific information withheld pursuant to Exemption 5 in this case, discussed in detail <u>*infra.*</u>

## II.    Plaintiff's FOIA Requests

On January 29, 2021, Plaintiff Reporters Committee for Freedom of the Press (RCFP) submitted two FOIA requests to OIP, which is the Department component that handles the FOIA administration for OAG and ODAG.

The first request—the "OAG Request"—sought records of the Office of the Attorney General and contained four subparts. *See* Compl., Ex. 1 at 2-3, ECF No. 1-1; Brinkmann Decl. ¶ 4; Brinkmann Decl. Ex. A.  Specifically, the OAG Request sought: (1) "[a]ll versions" of the News Media Policy "that have been in effect since January 21, 2017"; (2) "[a]ll emails sent or received since January 21, 2017 that include proposed or enacted modifications to the" News Media Policy; (3) "[a]ll emails and/or email attachments" to or from "former Acting Attorney General Matthew Whitaker, between November 7, 2018 and March 5, 2019, that include the phrase 'policy regarding obtaining information from, or records of, members of the news media'"; and (4) "[a]ll emails and/or email attachments" to or from "Attorney General William Barr, since February 14, 2019" that include the same specified phrase.  Brinkmann Decl. Ex. A.

The second request—the "ODAG Request"—sought records of the Office of the Deputy Attorney General and contained three subparts.  *See* Compl., Ex. 2 at 2-3, ECF No. 1-2; Brinkmann Decl. Ex. A.  The first two subparts of the OAG and ODAG Requests are identical except that they are directed at OAG and ODAG, respectively.  The third subpart of the ODAG Request sought "[a]ll emails and/or email attachments" to or from "former Deputy Attorney General Rod Rosenstein, between April 25, 2017 and May 12, 2019" that include the same specified phrase above.  Brinkmann Decl. Ex. A

OIP acknowledged RCFP's two FOIA requests on February 19, 2021.  Compl., Ex. 3, ECF No. 1-3; Brinkmann Decl. ¶ 5; Brinkmann Decl. Ex. B.  OIP informed RCFP that it had aggregated the two requests dated January 29, 2021 under a single tracking number, FOIA-2021-00670.

4

Compl., Ex. 3, ECF No. 1-3; Brinkmann Decl. ¶ 5; Brinkmann Decl. Ex. B.  OIP initiated its search

on February 19, 2021 by sending search notifications to its points of contact in OAG and ODAG.

Brinkmann Decl. ¶ 13.

## III.    The Instant Litigation

On May 11, 2021, RCFP filed suit in connection with the above-referenced FOIA requests.

Compl., ECF No. 1l Brinkmann Decl. ¶ 6.  On June 16, 2021, Defendants filed an answer.  Defs.'

Answer to Pls.' Compl., ECF No. 5.

By a letter dated July 16, 2021, OIP provided its first interim response to RCFP.

Brinkmann Decl. ¶ 7; *id.* Ex. C.  The July 16, 2021 interim response contained OIP's response to

subparts 1 and 3 of the OAG and ODAG Requests.  Second Joint Status Report at 2, ECF No. 9;

*see also* Brinkmann Decl. ¶ 7; *id.* Ex. C.  As to subpart 1 of the OAG and ODAG Requests, OIP

explained that "the policy you reference is codified in Department of Justice regulations at 28

C.F.R. § 50.10."  Brinkmann Decl. ¶ 7; *id.* Ex. C.  OIP further explained that, as "noted in the

Code of Federal Regulations, this policy was last updated by AG Order No. 3486-2015 on January

21, 2015."  Brinkmann Decl. Ex. C.  OIP stated that this explanation "constitutes our response to

subpart 1 of your requests."  *Id.*  As to subpart 3 of the OAG and ODAG Requests, OIP explained

that it had located one responsive record.  Second Joint Status Report at 2, ECF No. 9; *see also*

Brinkmann Decl. ¶ 7; *id.* Ex. C.  OIP released in full nine pages to RCFP on July 16, 2021.

Brinkmann Decl. ¶ 7; *id.* Ex. C.

Prior to the parties' August 6, 2021 joint status report, the parties conferred about the

parameters for the search for documents responsive to subpart 2 of the OAG and ODAG Requests.

Second Joint Status Report at 2, ECF No. 9; *see also* Brinkmann Decl. ¶ 18.  OIP proposed search

terms and custodians for this search and Plaintiff proposed a modification to the search terms,

which OIP accepted.  Brinkmann Decl. ¶ 18.  Thereafter, the parties "agreed regarding the

parameters of the initial search," ECF No. 9 at 2, which are described in detail in the Brinkmann declaration, Brinkmann Decl. ¶ 18. Subsequent to the initial search, OIP did not identify any basis to modify its initial search and Plaintiff did not propose any modifications. *Id.* ¶ 19.

By a letter dated October 5, 2021, OIP provided its second interim response to RCFP. Brinkmann Decl. ¶ 8; *id.* Ex. D. The October 5, 2021 interim response contained OIP's response to subpart 4 of the OAG Request and a status update regarding the search as to subparts 2 of the OAG and ODAG Requests. Third Joint Status Report at 2-3, ECF No. 10; *see also* Brinkmann Decl. ¶ 8; *id.* Ex. D. As to subpart 4 of the OAG Request, in its October 5, 2021 interim response, OIP informed RCFP that the search for records potentially responsive to that subpart had been completed and that no records responsive to that subpart were located. Brinkmann Decl. ¶ 8; *id.* Ex. D. As to subparts 2 of the OAG and ODAG Requests, in its October 5, 2021 interim response, OIP informed RCFP that the search for records potentially responsive to those subparts had been completed and that its review of the initial search results for material potentially responsive to those subparts was ongoing. Brinkmann Decl. ¶ 8; *id.* Ex. D. This search was performed using the search terms and custodians on which the parties previously conferred. Brinkmann Decl. ¶ 18.

By a letter dated June 2, 2022, OIP provided its final response to RCFP. Brinkmann Decl. ¶ 9; *id.* Ex. E. In its June 2 response, OIP stated that it had "completed the processing of subpart 2 of the OAG and ODAG requests." Brinkmann Decl. ¶ 9; *id.* Ex. E. OIP explained that, as a result, it was releasing "131 pages containing records responsive to" RCFP's request "with certain information withheld, some on behalf of the Criminal Division (CRM) and the Federal Bureau of Investigation (FBI), pursuant to Exemptions 5, 6, 7(C), and 7(E) of the FOIA, 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(E)." Brinkmann Decl. ¶ 9; *id.* Ex. E. OIP further explained that "448

pages containing records responsive to [RCFP's] request are being withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5)."  Brinkmann Decl. ¶ 9; *id.* Ex. E.

After OIP provided a draft *Vaughn* index to RCFP, the parties conferred about potentially narrowing the set of disputed issues requiring resolution by the Court.  Ninth Joint Status Report, ECF No. 16.  Plaintiff maintains that every withholding, whether in full or in part, is in dispute at this time.  *Id.*

## STANDARD OF REVIEW

Although the Freedom of Information Act "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'"  *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).  "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up) (quoting *FBI v. Abramson*, 456 U.S. 615, 630-31 (1981) and *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).  The Department bears the burden of justifying its withholdings of materials responsive to Plaintiff's FOIA request, and this Court reviews the Department's response to that request de novo.  *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment."  *Gilliam v. U.S. Dep't of Justice*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The defendant in a FOIA case must show . . . that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of

records have been disclosed after redaction of exempt information." *Light v. U.S. Dep't of Justice*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013). "To carry its burden at summary judgment" in a case involving Exemption 5, the Department must demonstrate that "the materials at issue are covered by the deliberative process privilege" and that "it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege." *Reporters Committee for Freedom of the Press v. FBI,* 3 F.4th 350, 361 (D.C. Cir. 2021) ("*RCFP*") (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)).

A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted); *see also Nova Oculus Partners, LLC v. U.S. Sec. & Exch. Comm'n*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) ("Agency affidavits are entitled to a presumption of good faith."). "Typically, the agency demonstrates the applicability of a FOIA exemption by providing affidavits regarding the claimed exemptions." *Shapiro v. U.S. Dep't of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Judicial Watch v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (citations omitted).

## ARGUMENT

### I. The Department's Search Was Reasonable.

The Department's search for records, which was performed after consultation with RCFP, was more than reasonable. An agency is entitled to summary judgment with respect to adequacy of its search if it "demonstrate[s] that it made a 'good faith effort to conduct a search . . . using

methods which can be reasonably expected to produce the information requested.'" *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original). The search is thus gauged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (cleaned up). In short, "[a] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *DiBacco*, 795 F.3d at 194-95 (quoting *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986)).

An agency can establish the reasonableness of its search by "reasonably detailed, nonconclusory affidavits describing its efforts." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006). Such affidavits are sufficient if they "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (quoting *McCready v. Nicholson*, 465 F.3d 1, 14 (D.C. Cir. 2006)). This standard is not demanding. "[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice . . . ." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted); *see*

*also Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir 2004) ("[M]ere speculation that as yet uncovered documents might exist[] does not undermine the determination that the agency conducted an adequate search for the requested records.").

As set forth in the Brinkmann declaration, OIP's search was reasonable. Brinkmann Decl. ¶¶ 13-20. In summary, subpart 1 of OIP's two requests[4] sought "[a]ll versions of" the News Media Policy "in effect since January 21, 2017"; in its first interim response on July 16, 2021, OIP properly directed the Plaintiff to 28 C.F.R. § 50.10, which indicated that the Policy had last been amended in 2015. Brinkmann Decl. ¶ 14. As to subparts 3 and 4 of the OAG Request and subpart 3 of the ODAG Request, Plaintiff specified the custodians (former Acting Attorney General Whitaker, then-Attorney General Barr, and former Deputy Attorney General Rosenstein, respectively), the dates of searches (November 7, 2018 to March 5, 2019; since February 14, 2019; and between April 25, 2017 and May 12, 2019, respectively), and the specific phrase to search ("policy regarding obtaining information from, or records of, members of the news media"). Brinkmann Decl. ¶¶ 15-17. OIP conducted searches using the date ranges and search terms keyed to locate records potentially responsive to each respective request subpart. Brinkmann Decl. ¶ 15.

As to subpart 2 of the two requests, which sought "[a]ll emails sent or received since January 21, 2017 that include proposed or enacted modifications to the" News Media Policy, OIP conferred with Plaintiff before completing its search. Second Joint Status Report at 2, ECF No. 9; Brinkmann Decl. ¶ 18. The date range employed by OIP was from January 21, 2017, as requested by Plaintiff, through February 19, 2021, reflecting the date that OIP initiated its search. Brinkmann Decl. ¶¶ 13, 18; *see also Defenders of Wildlife v. U.S. Dep't of the Interior*, No. 03-

---

[4] As noted in the Background section above, the first two subparts of the OAG and ODAG Requests are identical except that they are directed at OAG and ODAG, respectively.

1192, 2004 WL 842374, at *12 n.10 (D.D.C. Apr. 13, 2004) (recognizing that records created after the agency's "FOIA search began . . . are not covered by [the FOIA] request"). OIP proposed search terms and custodians for this search and Plaintiff proposed a modification to the search terms, which OIP accepted. *Id.* Thereafter, the parties "agreed regarding the parameters of the initial search," ECF No. 9 at 2, which are described in detail in the Brinkmann declaration, Brinkmann Decl. ¶ 18. Subsequent to the initial search, OIP did not identify any basis to modify its initial search and Plaintiff did not propose any modifications, Brinkmann Decl. ¶ 19, and though Plaintiff has informed Defendants that briefing regarding the reasonableness of OIP's search remains necessary, it recently stated that "it does not, at this time, intend to challenge the reasonableness of OIP's searches for responsive records." ECF No. 16 at 3.

On this record, the Court should conclude that the Department's search was reasonable.

## II. Predecisional, Deliberative Material Regarding Potential Changes Relating to the News Media Policy Were Properly Withheld Pursuant to Exemption 5.

Pursuant to Exemption 5, the Department properly withheld predecisional material pertaining to deliberations regarding potential modifications relating to the News Media Policy. Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters [which] would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Among the privileges protected by Exemption 5 is the deliberative process privilege. *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 601 (D.C. Cir. 2001). The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (cleaned up).

The privilege exists to "protect agencies from being 'forced to operate in a fishbowl' [and] is rooted in 'the obvious realization that officials will not communicate candidly among themselves

11

if each remark is a potential item of discovery and front page news.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973) and *Dep't of Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 8 (2001)).    The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options" and the fear that agency employees "would be chilled from such rigorous deliberation if they feared it might become public." *Judicial Watch  v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  "The privilege also avoids confusion from premature disclosure of ideas that are not—or not yet—final policy." *Id.*  And "it guards against 'confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.'" *RCFP v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

To come within the ambit of the deliberative process privilege, the records at issue must be inter-agency or intra-agency records that are both predecisional and deliberative.  *Fish & Wildlife Serv.*, 141 S. Ct. at 785–786.  A document is predecisional if it was "generated before the agency's final decision on the matter."  *Id.* at 786.  A document is deliberative when it is "prepared to help the agency formulate its position," *id.*, and it "reflects the give-and-take of the consultative process," *Judicial Watch v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (cleaned up).

Documents, or portions thereof, of each of the following categories were properly withheld pursuant to the deliberative process privilege.  All of the withheld records were "inter-agency or intra-agency" records.  5 U.S.C. § 552(b)(5).  As the Department explained, the information withheld pursuant to Exemption 5 "consists of communications, working drafts, and other records

generated by, exchanged within, and wholly internal to, DOJ." Brinkmann Decl. ¶ 23. Accordingly, Exemption 5's threshold "inter- or intra-agency" requirement is satisfied. For the reasons set forth below, the withheld materials in each of the following categories were also predecisional and deliberative.

### A. Deliberative Memorandum and Briefing Slides Proposing Options for Changes Relating to News Media Policy

In September 2017, OLP briefed the DAG regarding options for changes relating to the Department's News Media Policy. Brinkmann Decl. ¶ 28. In advance of that briefing, OLP prepared a memorandum describing the options that it had identified and a PowerPoint presentation summarizing those options. *Id.* The Department properly withheld the most deliberative portions of these two documents. *Id.*

*Options Memorandum.* The Department properly withheld the deliberative portions of the September 28, 2017 memorandum from OLP to the DAG outlining possible changes relating to the News Media Policy (Options Memorandum or Memorandum). The Options Memorandum explains that, "[a]t the direction of the Deputy Attorney General," OLP examined the Department's News Media Policy after the "Deputy Attorney General [had] asked for options for potential changes to the [Policy] and its implementation procedures . . . ." Brinkmann Decl. Ex. E at Bates 366. In response, OLP "reviewed a variety of materials," including the current and past versions of the Policy, and, as discussed further below, "discussed the policy extensively" with various Department components. *Id.* The memorandum then explains that, after "extensive discussion and deliberation, OLP, in consultation with the relevant components, [] identified five options for improving the Department's ability to effectively investigate and prosecute unauthorized disclosure cases[.]" *Id.* Among other things, the memorandum catalogs the history of the News Media Policy, including changes made in the prior administration, and describes "the options for

13

changes, along with their advantages and disadvantages." *Id.* The Department released portions

of the 14-page memorandum, including the first three paragraphs of Section I ("Introduction"), all

of Section II ("History of the Policy"), and all of Section III ("Changes to the Policy in the Previous

Administration." *Id.*; *see also* Brinkmann Decl. ¶¶ 28-29. The withheld portions—approximately

nine of the 14 pages—were properly withheld as predecisional and deliberative. *Id.*

The Options Memorandum was predecisional because it outlined options for a possible

decision about changes relating to the News Media Policy that had not yet been made. *Id.* In fact,

no changes to the News Media Policy were made at all during the deliberative process reflected in

the documents at issue. That no amendment to 28 C.F.R. § 50.10 followed OLP's Options

Memorandum does not mean, however, that the memorandum constitutes a final decision by the

Department. "A document is not final solely because nothing else follows it." *U.S. Fish & Wildlife*

*Serv.*, 141 S. Ct. at 786. As the Supreme Court explained last year:

> Sometimes a proposal dies on the vine. That happens in deliberations—some ideas
> are discarded or simply languish. Yet documents discussing such dead-end ideas
> can hardly be described as reflecting the agency's chosen course. What matters,
> then, is not whether a document is last in line, but whether it communicates a policy
> on which the agency has settled.

*Id.* (cleaned up). So too here. The Options Memorandum merely provided the DAG with options

for possible changes relating to the News Media Policy and did not itself constitute any final

agency decision.

The withheld portions of that memorandum were also deliberative. The withheld sections

of the Options Memorandum—like other "proposed materials that die on the vine"—are

deliberative because they "discuss and debate proposed agency policies, positions, and actions."

*RCFP v. FBI*, 3 F.4th at 367; *see also* Brinkmann Decl. ¶ 29. The released portions of the

memorandum explain "what deliberative process is involved" and "the role played by the

[memorandum] in issue in the course of that process." *Judicial Watch v. U.S. Dep't of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021) (cleaned up). The DAG asked OLP—which reports directly to the DAG[5]—"for options for potential changes to the" News Media Policy "and its implementation procedures to facilitate investigations and prosecutions" of unauthorized disclosures. Brinkmann Decl. Ex. E at Bates 366. OLP then reviewed various materials and "discussed the policy extensively" with various components. *Id.* The "role played by" the memorandum was to distill the various options that emerged from this consultative process and present them to the DAG for his consideration and further deliberation. Brinkmann Decl. ¶¶ 29-30. In particular, the withheld portions of the memorandum contain discussion of the options that OLP identified, including the advantages and disadvantages of each. Brinkmann Decl. Ex. E at Bates 367. Accordingly, these portions were properly withheld as deliberative.

*Briefing Slides*. The Department also properly withheld the deliberative portions of the briefing slides prepared by OLP in advance of its briefing to the DAG on September 29, 2017. Brinkmann Decl. ¶¶ 28-29; *id.* Ex. E at Bates 401-22. After receiving an earlier version of the Options Memorandum, ODAG explained that the "next step is to brief the DAG" and that "OLP would lead the briefing, walking the DAG through each of the five options." Brinkmann Decl. Ex. E at Bates 160. ODAG then asked if "OLP could put together a (short) power point presentation outlining the options" for the DAG. *Id.* The DAG's briefing was scheduled for the afternoon of September 29, 2017, Brinkmann Decl. ¶ 28; Brinkmann Decl. Ex. E at Bates 380; shortly before the briefing, OLP transmitted a final copy of the briefing slides to ODAG, Brinkmann Decl. ¶ 28; Brinkmann Decl. Ex. E at Bates 401. Half of the 20 briefing slides were

---

[5] Organizational Chart, U.S. Department of Justice, https://www.justice.gov/agencies/chart (last visited 11/01/2022).

released; those slides list the members of the working group involved in the deliberations that preceded the preparation of the Options Memorandum, catalog the evolution of the News Media Policy, and provide an overview of the current Policy. Brinkmann Decl. ¶ 32; Brinkmann Decl. Ex. E at Bates 403-13. The withheld slides summarize, for further deliberation by the DAG, the five options for modifying the News Media Policy that are described in greater detail in the Options Memorandum. Brinkmann Decl. ¶¶ 28-29. As with the memorandum, the withheld slides describe the advantages and disadvantages of the current policy as well as of the five options proposed for the DAG's consideration. *Id.* These withheld slides were properly withheld as predecisional and deliberative.

As with the Options Memorandum, the briefing slides were predecisional because they outlined options for a possible decision about changes relating to the News Media Policy that had not yet been made. Like the Options Memorandum, the slide presentation was a "paradigmatically predecisional document" in that it was "prepared to assist an agency decisionmaker in arriving at [a] decision, rather than to support a decision already made." *Campaign Legal Ctr. v. U.S. Dep't of Justice*, 34 F.4th 14, 23 (D.C. Cir. 2022) (herein, "*CLC*") (cleaned up). And, as with the Options Memorandum, that the briefing slides "did not lead to any final policy decision by [the Department] is . . . irrelevant as to whether the documents are predecisional." *Pub. Emps. for Env't Resp. v. DHS*, 575 F. Supp. 3d 34, 45 (D.D.C. 2021).

The withheld portions of the briefing slides were also deliberative. The slides "were prepared to help the agency formulate its position." *Fish & Wildlife Serv.*, 141 S. Ct. at 786. The slides served as an aid to OLP's briefing to the DAG regarding the options that it had identified, guiding the policy discussion during the briefing and assisting the DAG as he further deliberated over the options presented to him. The slides contained summary versions of the deliberative

material withheld from the Options Memorandum, including OLP's characterizations—formulated in consultation with other Department components—of the benefits and drawbacks of the options it had identified. The withheld portions of these slides were therefore properly treated as deliberative.

**B. Drafts of, and Deliberations Regarding, Memorandum and Briefing Slides Proposing Options for Changes Relating to News Media Policy**

Pursuant to Exemption 5, the Department properly withheld drafts of the September 2017 Options Memorandum and briefing slides, as well as deliberative discussions regarding both documents. *See* Brinkmann Decl. ¶¶ 33-34. All of these materials "reflect[] the give-and-take of the consultative process." *Judicial Watch*, 449 F.3d at 151 (cleaned up).

*Drafts of Options Memorandum and Related Discussions*. The final version of the Options Memorandum explains that, in identifying for the DAG various options for modifying the News Media Policy, OLP consulted with "members of the National Security Division, the Criminal Division, the FBI Office of the General Counsel, the Office of Public Affairs, and the U.S. Attorney's Offices for the District of Columbia and Eastern District of Virginia." Brinkmann Decl. Ex. E at Bates 366. For example, on August 8, 2017, OLP's Deputy Assistant Attorney General (DAAG) convened individuals from the aforementioned components to "go through [a list of options for altering the News Media Policy to identify] one or more to recommend." Brinkmann Decl. Ex. E at Bates 003. Two weeks later, on August 16, 2017, the OLP DAAG circulated "a draft memo outlining options for the DAG regarding possible changes to the Department's media policy," inviting comments from the group. Brinkmann Decl. Ex. E at Bates 006. Various officials responded with comments and proposed revisions, including the Chief of the Criminal Division in the U.S. Attorney's Office for the District of Columbia, Deputy Assistant Attorney General for the National Security Division, and Counsel to the Deputy Attorney General. Brinkmann Decl. Ex. E

at Bates 017-79.  On August 23, 2017, OLP's DAAG circulated "a revised version of the options paper" after "incorporating comments received from NSD, ODAG, and USAO-DC."  Brinkmann Decl. Ex. E at Bates 054.

On September 4, 2017, OLP's Principal Deputy Assistant Attorney General (PDAAG) circulated another version of the Options Memorandum.  Brinkmann Decl. Ex. E at Bates 093. Though this version was referred to as "the final version" of the memorandum, *id.*, attorneys within ODAG provided an additional set of revisions on September 14, 2017, Brinkmann Decl. Ex. E at Bates 156; *see also id.* at Bates 093-155.  Attorneys within ODAG, including the Principal Associate Deputy Attorney General (PADAG), provided further comments, asking that their "changes be made before the memo is provided to the DAG."  Brinkmann Decl. Ex. E at Bates 210.  ODAG sent to OLP a handwritten version of those edits on September 21, 2017 and a redline version, incorporating the PADAG's edits as well as further revisions by other attorneys within ODAG, on September 27, 2017.  Brinkmann Decl. Ex. E at Bates 210, 302.  The next day, on September 28, 2017, the DAG received the final version of the Options Memorandum for his consideration and further deliberation in advance of the September 29, 2017 briefing.  Brinkmann Decl. Ex. E at Bates 365.

These drafts and accompanying discussions are both predecisional and deliberative.  The drafts preceded the version of the Options Memorandum that was delivered to the DAG, which itself was a predecisional memorandum.  The drafts contain options for a possible decision and do not reflect any final agency position.  *Fish & Wildlife Serv.*, 141 S. Ct. at 785-86.

The drafts and related discussions are also core deliberative material.  "The withheld documents here are actively edited drafts of an unfinished, work-in-progress [Options Memorandum], along with emails exchanging ideas about what that [memorandum] should or

18

should not say." *CLC*, 34 F.4th at 27. These withheld materials "contain the type of back-and-forth exchange of ideas, constructive feedback, and internal debate" over possible changes relating to the News Media Policy and are "at the heart of the deliberative process privilege." *RCFP v. FBI*, 3 F.4th at 364.

For each of these drafts, the Department has identified the deliberative process involved (assessing whether and how to modify the Department's News Media Policy), who initiated that process (the DAG), who facilitated that process (OLP, which reports to the DAG), who provided comments to drafts of the Options Memorandum (drafts between attorneys within ODAG, including the PADAG; drafts between ODAG and OLP's DAAG and/or PDAAG; drafts between OLP's DAAG and Chief of the Criminal Division in the U.S. Attorney's Office for the District of Columbia; drafts between OLP's DAAG and NSD DAAG), and the role played by the withheld drafts (drafts of options exchanged as part of the deliberative process that preceded a briefing to the DAG to allow him to determine how, if at all, to modify the News Media Policy). Brinkmann Decl. ¶¶ 33-34. Here, there is "little mystery as to the who, what, where, and how of the deliberative process and the role played by [most of] the withheld material." *CLC*, 34 F.4th at 27–28 (cleaned up).

Finally, to the extent any portions of the draft memoranda are unchanged in the portions of the final version that the Department has already released, Plaintiff already has that information. "Peeking behind that to discern what portions of drafts were and were not incorporated would reveal the very deliberative process that the privilege protects." *RCFP v. FBI*, 3 F.4th at 365.

*Drafts of Briefing Slides and Related Discussions*. As discussed above, *see* Part II.A, *supra*, after OLP circulated an earlier version of the Options Memorandum, ODAG requested that OLP prepare slides to brief the DAG on the options contained in the memorandum. Brinkmann

Decl. Ex. E at Bates 160.  The OLP PDAAG provided a version of the briefing slides to ODAG on the morning of September 29, 2017, noting that "some additional changes" to the draft from OLP Assistant Attorney General were possible and that OLP would send "a final copy later" that day.  Brinkmann Decl. Ex. E at Bates 210.  OLP sent the final version shortly before briefing the DAG.  Brinkmann Decl. Ex. E at Bates 401.

The withheld draft of the briefing slides, as well as discussions about the content to be presented to the DAG verbally during the presentation, are predecisional and deliberative. Brinkmann Decl. ¶¶ 33-34.  The draft slides are predecisional for the same reasons that drafts of the Options Memorandum are:  They do not reflect a final agency decision, but instead constitute an earlier draft of the presentation provided to the DAG laying out options for him to consider.  *Id.* Similarly, the pre-briefing discussions are predecisional because they related to, and occurred before, the oral presentation to the DAG and do not contain or characterize any final agency decision.  *Id.*  The draft slides are deliberative because any changes between the two drafts would shed light on deliberations within OLP about what to present to the DAG.  *See RCFP v. FBI*, 3 F.4th at 365; *see also* Brinkmann Decl. ¶¶ 33-34.  The related discussions are deliberative because they would reveal OLP's and ODAG's back-and-forth about how best to characterize for the DAG the available options.  Brinkmann Decl. ¶¶ 33-34.

## C.  Draft Proposed Options Relating to Changing News Media Policy

The Department properly withheld drafts of proposed options relating to potential modifications of the News Media Policy, including bulleted lists of options as well as markups showing potential redline changes to the News Media Policy.  The Department also properly withheld portions of emails, subject lines, or attachment names which would, if released, reveal the content of options being considered.  Brinkmann Decl. ¶¶ 37-38.  All of these materials are predecisional and deliberative.

20

In August 2017, OLP circulated a "[l]ist of options" relating to changing the News Media Policy. Brinkmann Decl. Ex. E at Bates 003-004; *see also* Brinkmann Decl. ¶¶ 37-38. The list was attached to a calendar invite for an August 8, 2017 meeting "to go through the list identifying one or more [of the listed options] to recommend." *Id.* This list of options was prepared by OLP and served to guide initial deliberations regarding potential options for modifying the News Media Policy. After discussions with the participants at the August 8 meeting, OLP then prepared the initial draft of the Options Memorandum described above. *See* Part II.B, *supra*. Two months later, in November 2017, as deliberations about potential options remained ongoing, an ODAG official shared a two-page document setting forth potential options relating to changing the News Media Policy, noting that the document "draws from the very informative OLP/ODAG Options Memo and from recent experience." Brinkmann Decl. Ex. E at Bates 427-29.

Later in November, after a meeting with the PADAG, ODAG officials circulated a one-page document containing a list of options for changing the News Media Policy organized by various tiers. Brinkmann Decl. Ex. E at Bates 436-37. Drafts of this document were exchanged among ODAG officials in December 2017 and then shared with OLP in January 2018. *Id.* at Bates 439-40; 442; 445; 495.

Beginning in November, ODAG officials also exchanged draft markups of 28 C.F.R. § 50.10. *Id.* at Bates 431; 433; 435; 443. These markups contained, in redline form, drafts of options for modifying the News Media Policy. *See id.* at Bates 430 (attaching draft markup document and noting that the attached contained "some potential edits" to News Media Policy); *id.* at Bates 434 (sending draft markup document to PADAG and stating that it was a "[r]ough draft of revisions to" portion of News Media Policy "in red-line so that [the recipient] can see the proposed changes"). The filename of some of these markups, as well as accompanying cover

emails, referred to the content of one or more of the options being considered. Brinkmann Decl. ¶ 37; *see also* Brinkmann Decl. Ex. E at Bates 430, 432, 434, 441, 446, 447. In early December, officials within ODAG circulated a revised draft markup "to reflect [their] conversations with the DAG," with the ODAG official sending the revised draft noting that he thought he had "captured all of [the DAG's] edits." Brinkmann Decl. Ex. E at Bates 447. Later, in January 2018, officials in the Criminal Division sent to ODAG officials "an initial draft of redlines to the" News Media Policy, describing in the body of the email the nature of some of the proposed changes. Brinkmann Decl. Ex. E at Bates 449-71. Approximately two weeks later, officials within ODAG circulated a subsequent redline draft, which "incorporate[d] the changes [they] discussed with the DAG and certain additional proposals from OEO (only some of which we accepted)." Brinkmann Decl. Ex. E at Bates 472-93. On January 26, 2018, ODAG then sent to OLP that version of the redline draft, along with the options tier document, noting that "the DAG has reviewed, and is *inclined* to endorse, the changes identified in Tier 1, all of which are incorporated in the attached redlines." Brinkmann Decl. Ex. E at Bates 494 (emphasis added). ODAG also noted that the redlines included "certain changes recommended by OEO" which the DAG "has *not* reviewed," emphasizing that "before recommending any such changes, we should very carefully consider the potential costs and benefits." *Id.* (emphasis in original). In February 2018, the OLP DAAG sent a document titled "Questions for ODAG" to an Associate DAG, which was then circulated back to an Associate DAG / Deputy Chief of Staff and Senior Counselor to the DAG in advance of a meeting to discuss the News Media Policy. Brinkmann Decl. ¶ 37; *see also id.* Ex. E at Bates 517-20. That document contains a bulleted list of questions and considerations pertaining to potential changes relating to the News Media Policy that OLP wanted to discuss with ODAG. Brinkmann Decl. ¶ 37. In November 2018, Senior Counsel to the DAG reviewed and revised the January 2018

redline of the News Media Policy, sending the modified version to another ODAG official. Brinkmann Decl. E at Bates 529-49.  On December 31, 2018, the Senior Counsel sent the same November 2018 draft to the then-PADAG, who shared the draft with an official in the Office of the Attorney General, stating that the "redline . . . contain[ed] comments for some of the proposed changes."  *Id.* at Bates 550-52.

All of these withheld materials were predecisional and deliberative.  They were predecisional because they listed, described, or contained proposed options relating to potential modifications of the News Media Policy that ultimately did not come to fruition during the deliberative process reflected in the documents at issue.  *See Fish & Wildlife Serv.*, 141 S. Ct. at 785-86.  They were deliberative because they contained "[p]roposed drafts of a non-final agency decision that [was] still undergoing review, debate, and editing," material that is the "type of deliberative work in progress that falls at the core of the deliberative process privilege."  *RCFP v. FBI*, 3 F.4th at 364.  The deliberative process privilege applies "to proposed materials that die on the vine like . . . draft regulations that never see the light of day."  Like the draft options outlined in these withheld materials, "[t]hose types of documents discuss and debate proposed agency policies, positions, and actions."  *Id.* at 367.  These draft materials, described in detail above and in the accompanying declaration, *see* Brinkmann Decl. ¶ 37, included lists of options for modifying the News Media Policy, proposed redlines to the Policy, and discussions about the proposed redlines.  They "contain close line edits and editorial suggestions by named officials in the Department" on a "sensitive, important, and potentially controversial" issue.  *CLC*, 34 F.4th at 27. And these drafts were exchanged as part of the deliberative process that involved briefing the DAG to reach a final decision on potential modifications relating to the News Media Policy, a

determination that did not occur during the deliberative process reflected in the documents at issue. All of these materials are therefore deliberative and properly withheld.

Markups reviewed or proposed by the DAG circulated among subordinates within ODAG and sent to OLP are equally protected by the deliberative process privilege.  First, as with the other drafts of proposed options, they were predecisional.  That is clear from the face of the partially redacted documents, *see* Brinkmann Decl. Ex. E at Bates 494 (noting that the DAG had reviewed and proposed revisions to the markup document and that he was "inclined" to endorse certain changes), later-in-time documents that show the proposed revisions had not yet been approved, *see id.* at Bates 522 (outlining timetable for "determining and finalizing any proposed revisions to the" News Media Policy), and the fact that no changes to 28 C.F.R. § 50.10 were finalized during the deliberative process reflected in the documents at issue.  These materials were also deliberative. While "Exemption 5 is generally designed to protect subordinates' advice to superiors," there "is no such directional precondition to protection under the deliberative process privilege."  *RCFP v. FBI*, 3 F.4th at 364 (citation omitted). "[A]t the end of the day, the key to whether a document is deliberative is whether it is part of the 'give-and-take' of the 'consultative process'" and "when such an internal agency dialogue is underway, communications by both the giver and the taker can fall within the privilege." *Id* (citation omitted).

Finally, the Department also properly withheld references in the body of emails, email subject lines, and attachment file names that would reveal, if released, the proposed options being considered by OLP, ODAG, and the working group.  Brinkmann Decl. ¶ 37-38.  These materials are predecisional for the same reasons stated above.  They are also deliberative in that release of this information would expose details of the confidential deliberations regarding the options being evaluated.  For example, in November 2017, ODAG officials exchanged a redline that included

24

proposed changes to a portion of 28 C.F.R. § 50.10.  Brinkmann Decl. Ex. E at Bates 430.  The

title of that document, as well as the content of the accompanying email, refers to an aspect of

§ 50.10 to which the proposed redline changes are being made.  Revealing that information would

be akin to revealing information about the substance of the options being considered by the

Department and the agency's ongoing deliberative process.  *See Russell v. Dep't of the Air*

*Force,* 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Exemption 5 "protects not only communications

[that] are themselves deliberative in nature, but all communications [that], if revealed, would

expose to public view the deliberative process of an agency.").

### D.  Deliberative Engagement Strategy

The Department properly withheld documents which describe proposed steps to continue

the News Media Policy review process, including developing an internal process to finalize any

modifications and an engagement strategy regarding the proposed modifications.  Brinkmann

Decl. ¶ 41.  Within this category of documents, the Department withheld portions of an email from

one ODAG official to others within ODAG titled "Update – Policy Review Process," describing

potential next steps and attaching the latest versions of draft redlines to the News Media Policy.

*Id.*  The Department also withheld drafts of a document titled "Proposed Process to Determine and

Finalize Potential Revisions to Media Subpoena Policy," which was attached to emails between

ODAG and OLP officials with the subject line "Engagement Plan."  *Id.*  Finally, the Department

withheld the most deliberative portions of the final version of this document.

These materials were predecisional and deliberative, and therefore were properly withheld

by the Department.  Discussions, drafts, and portions of the final version of the "engagement plan"

were protected from disclosure by Exemption 5 because they contain discussion of whether and

how to finalize certain modifications relating to the News Media Policy—not a description of any

final agency decision to modify any particular aspect of the Policy.  *Id.* ¶ 42.  They also contain

discussion about who to engage with and how to implement any potential modifications—discussion that preceded final modifications, which did not ultimately come to fruition during the deliberative process reflected in the documents at issue. *Id.* Just as deliberations "discuss[ing] the content of a new policy and alternative paths for its effective implementation . . . fall squarely within the deliberative process privilege," so too do discussions about a *potential* new policy and paths for *potentially* implementing it. *RCFP*, 3 F.4th at 368 (regarding emails between FBI attorneys and other FBI personnel discussing the implementation of the new interim policy on impersonation of journalists).

The withheld documents' discussions about who to engage with in finalizing a proposed policy change, as well as proposals for how to describe and explain that potential change, are similarly covered by the deliberative process privilege. Brinkmann Decl. ¶ 42. As the D.C. Circuit explained earlier this year, "agency choices about what rationales, justifications, and limitations to provide—and which to leave out—in articulating an important agency decision can involve difficult and substantive policy determinations." *CLC*, 34 F.4th at 24. "Debate and discussion about such statements precede—are predecisional to—the actual determination of how best both to define the scope and contours of the new policy, and to persuasively communicate its terms and rationale to the public." *Id.* "[E]ven after an agency head has set the direction of agency policy at the macro level, the subsequent work needed to define, refine, debate, and flesh out the boundaries of and justifications for that position can" qualify for protection under the deliberative process privilege. *Id.* The Department therefore properly withheld as protected by the deliberative process privilege portions of documents that "intended to map out, in detail, the strategic process of with whom to engage, when and how to engage them, what was to be done after selection of the

option(s) to modify the media subpoena policy to pursue and how, all with the intention to create a successful implementation of the selected option(s)."  Brinkmann Decl. ¶ 42.

### E.  Potential Policy Modifications Being Pursued by Criminal Division

The Department properly withheld four portions of an email exchange between an official in the Criminal Division and an official in ODAG describing "several of the current projects being handled" by the Division's Office of Enforcement Operations (OEO).  Brinkmann Decl. ¶ 45; *id.* Ex. E at Bates 001-002.  The withheld material describes four potential guidance and/or policy modifications under consideration by OEO, one of which pertains to the News Media Policy. Brinkmann Decl. ¶ 45.

The withheld material was predecisional and deliberative for the same reasons set forth above.  *See* Parts II.B, II.C, *supra*.  The relevant email was sent to ODAG by OEO's former Director on June 1, 2017 prior to the adoption and implementation (if any) of the proposed changes—and two months prior to circulation of the initial draft of the Options Memorandum. Brinkmann Decl. ¶¶ 45-46.  The material was deliberative in that it reflects OEO's assessment of how best to improve DOJ policies administered by OEO as well as proposed modifications to such policies and/or guidance.  *Id.*  The deliberative process privilege protects OEO's "candid opinions and recommendations to decisionmakers" and the Department therefore properly withheld the deliberative portions of the June 1 email pursuant to Exemption 5.  *RCFP*, 3 F.4th at 361.

### F.  Deliberative Discussion Regarding Potential Response to Press Inquiry

The Department also properly withheld portions of an email between ODAG officials discussing whether and how to respond to "a story on the media subpoena policy."  Brinkmann Decl. Ex. E at Bates 558; *see also* Brinkmann Decl. ¶¶ 49-50.  In the thread, a reporter is engaging with an official within the Department's Office of Public Affairs.  Brinkmann Decl. ¶¶ 49-50.  The

inquiry is elevated to an ODAG official, who then outlines options for and recommendations regarding potential responses to the press inquiry.  *Id.*

Internal agency deliberations about whether and how to respond to press inquiries are routinely found to be protected by the deliberative process privilege.  *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. U. S. Dep't of Justice*, 45 F. 4th 963, 975-76 (D.C. Cir. 2022) ("an agency's deliberations about how to communicate its policies are privileged, just like its deliberations about the content of those policies"); *Judicial Watch v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 31 (D.D.C. 2011) ("to the extent that the emails discussed how to respond to press inquiries, internal communications regarding how to respond to press inquiries have been held to be protected under the deliberative process privilege"); *Judicial Watch v. U.S. DHS,* 736 F. Supp. 2d 202, 208–09 (D.D.C. 2010) (concluding that the deliberative-process privilege covered e-mails "discuss[ing] how to respond to on-going inquiries from the press and Congress" regarding an earlier agency decision); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Labor,* 478 F. Supp. 2d 77, 83 (D.D.C. 2007) (finding that deliberative process privilege covered email messages discussing the agency's response to news article).

The portions of the email exchange at issue were also predecisional and deliberative.  The discussion about a potential response to this press inquire precedes any final decision about how to respond.  Brinkmann Decl. ¶ 50.  The discussion also contains the impressions of the ODAG official who authored the email and, if revealed, would shed light on the predecisional deliberation as to whether or how the Department should respond to the inquiry from the press.  *Id.*  The Department therefore properly invoked Exemption 5 in withholding portions of this email thread.

### III.    Deliberative Legal Advice Relating to Potential Changes Relating to the News Media Policy Was Properly Withheld Pursuant to Exemption 5.

Pursuant to Exemption 5, the Department properly withheld a portion of a document reflecting confidential legal advice provided by the Office of Legal Counsel (OLC) to ODAG. The attorney-client privilege "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (citing *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)).  To invoke the attorney-client privilege, a party must demonstrate that the document it seeks to withhold: (1) involves "confidential communications between an attorney and his client"; and (2) relates to "a legal matter for which the client has sought professional advice."  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).  "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer."  *Tax Analysts,* 117 F. 3d at 618. Within the Department, the Assistant Attorney General in charge of OLC exercises the delegated authority of the Attorney General to provide legal advice to the President and all Executive Branch agencies, as well as to other components of the Department, including ODAG.  *See* 28 C.F.R. § 0.25; *see also* Brinkmann Decl. ¶ 57.

The Department properly withheld a portion of an email communication from one ODAG official to others within ODAG describing confidential legal advice he received from OLC attorneys.  *See, e.g.*, *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116, 130–31 (D.D.C. 2019) (finding that legal advice and analysis of arguments made in an "Issue Paper" from agency's Office of General Counsel to agency component was properly withheld pursuant to Exemption 5).  The advice provided was legal advice, as opposed to policy or other types of advice, and it pertained to legal issues relating to potential modifications of the News Media Policy.  Brinkmann Decl. ¶¶ 57-58.  The advice was provided in confidence from

OLC attorneys to ODAG, the client component.  *Id.*  The ODAG official who received the advice

kept the advice confidential, sharing it only with other officials within ODAG.  *Id.*; *see Mead Data*

*Cent. Inc.*, 566 F.2d at 257 ("It would exalt form over substance to exempt documents in which

staff recommend certain action or offer their opinions on given issues but require disclosure of

documents which only 'report' on what those recommendations and opinions are.").

Additionally, as with other predecisional, deliberative material withheld by the Department

and described more fully above, the legal advice is also protected by the deliberative process

privilege.  Brinkmann Decl. ¶¶ 53-54.  The legal advice provided by OLC and conveyed by one

ODAG official to others within ODAG sheds light on the ways in which the Department was

considering modifying the News Media Policy and was part of the "back-and-forth exchange of

ideas, constructive feedback, and internal debate" over possible changes relating to the News

Media Policy covered by the deliberative process privilege.  *RCFP*, 3 F.4th at 364.

## IV. Phone Numbers and Email Addresses of DOJ Employees and Members of the Press Were Properly Withheld Pursuant to Exemption 6.

Pursuant to Exemption 6, the Department properly withheld contact information of DOJ

employees and members of the press.  Exemption 6 allows an agency to withhold information

about individuals in "personnel and medical files and similar files" when the disclosure of such

information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C.

§ 552(b)(6).  Exemption 6 can be applied to "bits of personal information, such as names and

addresses, the release of which would create[] a palpable threat to privacy."  *Walston v. U.S. Dep't*

*of Def.*, 238 F. Supp. 3d 57, 66 (D.D.C. 2017) (citing *Judicial Watch*, 449 F.3d at 152).  For this

exemption to apply, the information at issue must be maintained in a government file and apply to

a particular individual.  *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982).

Once this threshold requirement is met, Exemption 6 requires the agency to balance the

individual's right to privacy against the public's interest in disclosure.  *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

The Department properly determined that Exemption 6 protects from disclosure email addresses and phone numbers of DOJ employees.  The Department correctly concluded that the "release of the contact information of these DOJ officials would not aid the public's understanding of how the Department carries out its duties, particularly when considering that the identities of these individuals were released, and only their direct contact information was withheld." Brinkmann Decl. ¶ 63.  In light of the privacy interests in protecting this contact information, including current government officials' accounts that use a similarly formatted email address as departed officials as well as phone numbers of cell phones that may be reused, *id.* ¶ 64, the Department properly determined that the balance required by Exemption 6 tipped in favor of withholding the contact information, *id.* ¶ 65.

The Department also properly determined that Exemption 6 protects from disclosure non-public email addresses and phone numbers of members of the press communicating with employees of the Department.  As the Department concluded, "releasing the non-public phone numbers and email addresses of these members of the press would in no way enhance the public's understanding of how the Department carries out its duties."  *Id.* ¶ 66.  In light of the privacy interests that members of the press maintained in their non-public contact information, the Department properly found that the privacy interests possessed by these members of the press outweighed the lack of public interest in disclosure of their contact information.  *Id.* ¶¶ 67-68.

31

V.    **Name and Email Address of Non-SES FBI Special Agent Were Properly Withheld Pursuant to Exemptions 6, 7(C), and 7(E).**

Pursuant to Exemptions 6 and 7(C), the FBI properly withheld the name of a non-SES level FBI Special Agent and, pursuant to Exemptions 6, 7(C), and 7(E), properly withheld the Special Agent's internal FBI email address.

*Name of Non-SES Level FBI Special Agent*.  As set forth above, *see* Part IV, *supra*, Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

As a threshold matter, for Exemption 7(C) to apply, the records at issue must have been compiled for law enforcement purposes.  *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008).  "To determine whether records are compiled for law enforcement purposes, [the D.C. Circuit] has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding."  *Clemente v. FBI,* 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted).  This is not a burdensome exercise.  Documents are "compiled for law enforcement purposes" if they were, for example, "created to prevent crime and keep people safe," *Elec. Privacy Info. Ctr. v. DHS*, 777 F.3d 518, 522-23 (D.C. Cir. 2015); "deter illegal activity and ensure national security," *Sack v. Dep't of Def.*, 823 F.3d 687, 694 (D.C. Cir. 2016); or otherwise show a "rational nexus between the investigation and one of the agency's law enforcement duties and a

connection between an individual or incident and a possible security risk or violation of federal law," *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citations omitted)).

Once it has been determined that a record was compiled for law enforcement purposes, Exemption 7(C)—like Exemption 6—requires individual privacy rights to be balanced against the public interest in disclosure. *See, e.g.*, *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 762 (1989). However, courts have consistently held that Exemption 7(C) "is more protective of privacy than Exemption 6." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see NARA v. Favish*, 541 U.S. 157, 165-66 (2004) (comparing statutory language of Exemptions 6 and 7(C)). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014)). Nonetheless, given the similarities between Exemptions 6 and 7(C), case law pertaining to one is often germane to the other. *See Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

The FBI properly withheld the name and other identifying information of the non-SES level (GS-15 or below) FBI Special Agent who served as a member of the News Media Policy working group. During the relevant time period, the Special Agent was an FBI Office of General Counsel Counter Intelligence Unit Chief. Ex. 2, Decl. of Michael G. Seidel (Nov. 4, 2022), ¶ 15 (Seidel Decl.). The Special Agent was assigned to the working group tasked with reviewing and recommending possible modifications relating to the News Media Policy "to facilitate investigations and prosecutions of unauthorized disclosures of national defense information or of classified information." Brinkmann Decl. Ex. E at Bates 366; *see also* Seidel Decl. ¶ 11.

The withheld information was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C). The working group explored "options for improving the Department's ability to effectively investigate and prosecute unauthorized disclosure cases" through possible changes relating to the policy governing obtaining information from, and questioning, arresting, or charging, members of the news media. Brinkmann Decl. Ex. E at Bates 366; *see also* Seidel Decl. ¶ 11. Among other considerations, the underlying regulations balance important First Amendment interests and the need to "deter illegal activity and ensure national security." *Sack*, 823 F.3d at 694. Accordingly, the FBI properly concluded that there is at least a "rational nexus between" the News Media Policy deliberations "and one of the agency's law enforcement duties." *Blackwell*, 646 F.3d at 40.

Further, the FBI reasonably concluded that the public interest in identifying by name the particular OGC Counter Intelligence Unit Chief on the working group was outweighed by the privacy interest in shielding the Special Agent's name from disclosure. Seidel Decl. ¶ 15. The FBI explained that persons targeted by or sympathetic to those targeted by certain investigative techniques "could seek to inflict violence on" a Special Agent "based on their participation an investigation/in the deployment of certain investigative techniques or in their involvement in assessing and recommending changes to specific policies that would impact a specific group of individuals." *Id.* Meanwhile, there is little or no public interest served by disclosing the name of the Special Agent "because his or her identity would not, by itself, significantly increase the public's understanding of the FBI's operations and activities," particularly where the Special Agent's title has been made publicly available. *Id.* Accordingly, the FBI properly withheld the Special Agent's name pursuant to Exemptions 6 and 7(C).

*Internal FBI Email Address.*  In addition to being protected from disclosure by Exemptions 6 and 7(C) for the reasons set forth immediately above, the FBI properly withheld the internal email address of the non-SES Special Agent working group member.  To withhold information pursuant to Exemption (7)(E), an agency must demonstrate that release of the "records or information compiled for law enforcement purposes . . . would disclose techniques and procedures for law enforcement investigations or prosecutions," or would "disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).[6]

Disclosure "reasonably . . . risk[s] circumvention of the law" where it "might increase the risk 'that a law will be violated.'" *See PEER*, 740 F.3d at 204–05 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  An agency satisfies this "relatively low bar" by "demonstrat[ing] logically" that disclosure might increase the risk of evasion of the law.  *Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 32 (D.D.C. 2018) (cleaned up).  Even if a law enforcement technique or procedure is generally known, protection under Exemption 7(E) is proper if its use in a particular manner or circumstance is nonpublic and disclosure of such use could "reduce or nullify" its effectiveness.  *Vazquez v. U.S. Dep't of Justice*, 887 F. Supp. 2d 114, 116–17 (D.D.C. 2012) (citation omitted), *aff'd*, 2013 WL 6818207 (D.C. Cir. Dec. 18, 2013).

---

[6] Courts within the D.C. Circuit and elsewhere are divided as to whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies only to "guidelines," or also applies to "techniques and procedures."  *See Pub. Emps. for Envt. Resp. v. Int'l Boundary & Water Comm'n.,* 740 F.3d 195, 204 & n.4 (D.C. Cir. 2014) (herein, *PEER*) (discussing the D.C. Circuit's practice without holding either way).  But, as the D.C. Circuit explained in *PEER*, "in any event, given the low bar posed by the 'risk circumvention of the law' requirement, it is not clear that the difference matters much in practice."  *Id.*

As discussed above, the working group deliberations occurred for law enforcement purposes, namely, to evaluate and brief the DAG regarding options for modifying the News Media Policy "to effectively investigate and prosecute unauthorized disclosure cases."  Brinkmann Decl. Ex. E at Bates 366.  Additionally, the Seidel Declaration explains that the "FBI's internal email system and the email addresses thereof are law enforcement techniques and/or procedures that the FBI uses to securely communicate regarding its law enforcement and national security operations."  Seidel Decl. ¶ 18.  Further, disclosure of the Special Agent's internal email address could enable criminals to circumvent the law by providing them "with specific targets for cyber-attacks or other attacks on FBI secure communications."  *Id.*  The FBI explained that "it is likely that the release of this information could provide hackers with avenues to exploit the FBI's information technology system," using the information "to gain unauthorized access to FBI systems, view and manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications."  *Id.*  In light of these concerns about reasonable risk of circumvention of the law, district courts have found that the FBI properly has withheld internal email addresses pursuant to Exemption 7(E) in similar circumstances.  *See, e.g.*, *Poitras v. DHS*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (holding that "internal, non-public email or IP addresses . . . [were] properly [] withheld to prevent the disclosure of FBI techniques and procedures and to prevent the dissemination of information that might be gleaned from those techniques and procedures").  The FBI properly withheld the Special Agent's internal FBI email address pursuant to Exemption 7(E).

## VI.    All Reasonably Segregable, Non-Exempt Information Has Been Released.

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are

inextricably intertwined with exempt portions." *Mead Data Cent., Inc.*, 566 F.2d at 260. But this provision does not require disclosure of records in which the non-exempt information that remains is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 221 (D.D.C. 2005). And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. U.S. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Consistent with this obligation, OIP and FBI have conducted a thorough review of the unredacted versions of the relevant records and concluded that there is no additional, non-exempt information that may reasonably be segregated and released without undermining the interests underlying the cited exemptions. *See* Brinkmann Decl. ¶¶ 32, 36, 40, 44, 48, 52, 56, 59; Seidel Decl. ¶¶ 7, 19. The records that have been released in part make that clear. For example, the Department withheld the most deliberative portions of the Options Memorandum and the slides used to brief the DAG while releasing other portions, including the list of the working group members, the history of the News Media Policy, and recent amendments to the Policy by the prior administration. *See* Brinkmann Decl. ¶ 32. The Department therefore properly "sift[ed] out non-deliberative factual content from deliberative policy judgments," releasing the former and withholding only the latter. *RCFP*, 3 F.4th at 365. The Department and the FBI did the same with other records. Therefore, because Ms. Brinkmann's and Mr. Seidel's declarations establish that all reasonably segregable, non-exempt information has been released, summary judgment should be granted for Defendant. See *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (noting "presumption" that agencies "complied with the obligation to disclose reasonably segregable material").

## VII.    Disclosure of the Withheld Information Would Harm Interests Protected by FOIA Exemptions.

Under the FOIA Improvement Act of 2016, in order to justify the withholding of a responsive record, the government must show that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) [of FOIA]," or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *RCFP*, 3 F.4th at 369-70 (discussing foreseeable harm standard).   The legislative history of this amendment acknowledges that the provision "does not alter the scope of information that is covered under an exemption."  H.R. Rep. No. 114-391, at 10 (2016).  Indeed, the amendment codified existing government policy that had been in place for years.   See *id.* at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4, at 8 (same); Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum).   And the Department already employed this standard when defending agency withholdings in litigation. *See* H.R. Rep. No. 114-391, at 9.  As recently described by the D.C. Circuit, to satisfy the foreseeable harm requirement, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *RCFP*, 2021 WL 2753938 at 369.

Foreseeable harm analysis first requires identification of the interests protected by the relevant FOIA exemptions.  The deliberative process privilege "protect[s] agencies from being 'forced to operate in a fishbowl.'" *U.S. Fish & Wildlife Serv*, 141 S. Ct. at 785 (2021) (cleaned up).  The privilege serves a number of important purposes: it "assures agency staff that they can provide their candid opinions and recommendations to decisionmakers without fear of ridicule or reprisal," it "protects policymakers from premature disclosure of their proposals before they have been completed or adopted," and it "it guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action

38

which were not in fact the ultimate reasons for the agency's action." *RCFP*, 3 F.4th at 361 (cleaned

up).  The purpose of the attorney-client privilege "is to encourage full and frank communication

between attorneys and their clients and thereby promote broader public interests in the observance

of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

"The privilege recognizes that sound legal advice or advocacy serves public ends and that such

advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.*  Exemption

6, meanwhile, exists to prevent undue intrusions on personal privacy, *see Judicial Watch*, 449 F.3d

at 152, while Exemption 7 itself enumerates various harms that it guards against, *see* 5 U.S.C.

§ 552(b)(7)(C) ("an unwarranted invasion of personal privacy"); *id.* § 552(b)(7)(E) ("risk [of]

circumvention of the law").

   In performing the foreseeable harm analysis, context matters.  The analysis requires review

of the "particular type of material at issue . . . in the specific context of the agency action at issue."

*RCFP*, 3 F.4th at 370.  "Disclosing internal deliberations about controversial issues, like those at

issue here, can be especially likely to endanger candid discussion within the agency."  *CLC*, 34

F.4th at 28 (cleaned up).  As the D.C. Circuit held in a similar context, the "very nature of the

follow-on discussions among [Department and] FBI personnel about whether and how to change"

policy "and how to effectively implement such changes amid ongoing law enforcement

operations" provides "particularized indicia of foreseeable harm." *RCFP*, 3 F.4th at 372.  "On this

record, the agency reasonably concluded that disclosure would likely impair the candid discussion

of tactical options and proposals for adjusting operations going forward." *Id.*

   The Brinkmann declaration explains how disclosure of the information at issue—in the

context of internal, high-level policy about potential modifications relating to an important agency

policy concerning law enforcement techniques used in highly sensitive investigations—would

foreseeably harm these interests.  *See, e.g.*, Brinkmann Decl. ¶ 30.  As to the deliberative process privilege, disclosure of the potential changes relating to the News Media Policy, as well as deliberations about such potential changes, would impair the willingness of Department officials to provide candid advice about the advantages and disadvantages of the modifications under consideration as well as inhibit decisionmakers, like the DAG, from receiving "accurate, informed, and thoroughly vetted [policy] options."  *Id.*  "[A]ny further release of the specific information withheld in these records would cause reasonably foreseeable harm to the Department's ability to have a robust internal deliberative process in furtherance of its analysis to improve its ability to effectively investigate and prosecute unauthorized disclosure cases because Department officials would temper the internal presentations required to respond effectively and accurately to inquiries from leadership . . . ."  *Id.*  That is especially true in the context here, where the News Media Policy and its implementation are often under public scrutiny.  *See id.*; *see also id.* Ex. E at Bates 367-71.  Disclosure would also sow "public confusion by releasing information considered internally, but not ultimately adopted or provided publicly," leading to uncertainty about the existing regulations.  Brinkmann Decl. ¶ 30.  The Brinkmann declaration elaborates on these harms as to further release of the Options Memorandum and briefing slides, *see id.*, and drafts of and deliberations about these materials, *see id.* ¶ 35, as well as those harms that would flow from disclosure of other withheld deliberative material, *see id.* ¶¶ 39, 43, 47, 51, 55.

The Brinkmann declaration also describes how release of the confidential legal advice provided by OLC to ODAG "would substantially impede the sharing of candid legal advice that is critical to the component's unique role in providing legal counsel through the Executive Branch." *Id.* ¶ 58; *see also id.* ¶ 59.  Finally, the Brinkmann declaration explains how release of contact information of DOJ employees and members of the press would foreseeably subject such

individuals "to an increased risk of harassment" and "risk misuse and disruption of the proper and efficient use of official DOJ email accounts and communication systems." *Id.* ¶¶ 64, 67.

As set forth in Part V, *supra*, the Seidel declaration also explains how disclosure of the information at issue would foreseeably harm the interests protected by the privileges invoked by the FBI. *See* Seidel Decl. ¶ 15 (explaining that persons targeted by or sympathetic to those targeted by certain investigative techniques "could seek to inflict violence on" a Special Agent "based on their participation an investigation/in the deployment of certain investigative techniques or in their involvement in assessing and recommending changes to specific policies that would impact a specific group of individuals"), *id.* ¶18 ("it is likely that the release of [FBI internal email address] could provide hackers with avenues to exploit the FBI's information technology system," using the information "to gain unauthorized access to FBI systems, view and manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications.").

On this record, the Department and the FBI have adequately demonstrated the foreseeable harm that would flow from further disclosure of the records at issue.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment.

Dated: November 4, 2022          Respectfully submitted,

                                 BRIAN M. BOYNTON
                                 Principal Deputy Assistant Attorney General

                                 ELIZABETH J. SHAPIRO
                                 Deputy Director

_/s/ Michael J. Gaffney_____
MICHAEL J. GAFFNEY
Trial Attorney (D.C. Bar No. 1048531)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC  20530
Telephone:      (202) 514-2356
Facsimile:      (202) 616-8470
E-mail:          Michael.J.Gaffney@usdoj.gov

_Counsel for Defendants_

42